# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

### Assigned on Briefs November 10, 2009

## FRANKLIN HOWARD. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 95-07822      John T. Fowlkes, Judge**

---

**No. W2009-00279-CCA-R3-PC   -   Filed June 17, 2010**

---

Following a remand for a new trial on the charge of first-degree premeditated murder, *see State v. Howard*, 30 S.W.3d 271 (Tenn. 2000), the Petitioner, Franklin Howard, was convicted of premeditated murder and two counts of felony murder, and the trial court imposed a life sentence. On direct appeal from the second trial, this Court reversed and dismissed the felony murder convictions but affirmed the premeditated murder conviction. *State v. Franklin Howard*, No. W2002-01680-CCA-R3-CD, 2004 WL 2715346 (Tenn. Crim. App. Nov. 18, 2004), *perm. app. denied*, (Tenn. Mar. 21, 2005). The Petitioner filed a petition for post-conviction relief claiming he received the ineffective assistance of counsel. The post-conviction court denied relief after a hearing, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the Appellant, Franklin Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clark Thornton, Assistant Attorney General; William L. Gibbons, District Attorney General; P. Thomas Hoover, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial and Sentencing

On direct appeal, this Court set forth the following summary of the facts underlying this appeal:

The homicide victim, Gene Frieling, was an employee of TGI Fridays (TGIF) restaurant chain and was transferred to Memphis to participate in the management of a TGIF location. In the early morning hours of January 28, 1995, a 9-1-1 emergency call alerted police of "shots fired" at the TGIF location. Upon arriving at the scene, officers discovered the deceased victim, sitting in the floor near the office. He had suffered a gunshot wound in his shoulder that penetrated his lungs and heart. A second man, Preston Shea, was beneath a counter in the office. Mr. Shea, the TGIF bartender on duty when the restaurant closed, had been shot multiple times, although he ultimately survived the shooting.

The restaurant's office was accessed from the rear of the restaurant by a door and a short hallway. The door could be opened from the inside via an "alarm type" handle but, when closed, could not be opened from the outside. Officers recovered nine-millimeter shell casings and two .380 shell casings from the office area. They also recovered a bullet fragment from the person of Mr. Shea. The officers were unable to extract fingerprints from the crime scene. A regional TGIF executive came to the scene and determined that, at the time of the assault, the victim had been preparing to deposit the day's receipts and that, based upon cash register records, approximately $5,400 was missing.

John Paul Wong testified that he was working as a dishwasher at TGIF during the evening of January 27 and early morning hours of January 28, 1995. His duties entailed taking refuse to the dumpster behind the restaurant after closing and just before the restaurant was secured for the night. He exited the rear of the building via the hallway and the one-way door. In making his first trip to the dumpster, he propped open the door with a broom, a common practice among employees who went outside, intending to re-enter the building. As he started out the door with the second haul of refuse, he was "pounced upon" by four dark-clothed intruders wearing ski masks. Someone shoved a gun in his face, threatened to shoot him, and pushed him back into the hall where he was placed face-down on the floor. Shortly thereafter, a waitress, Jessica Hoard, was placed on the floor near Mr. Wong. Then, Mr. Wong heard shots and people running. After the intruders left, Mr. Wong found the homicide victim and Mr. Shea wounded and lying on the floor. He propped up the homicide victim.

Jessica Hoard testified the restaurant closed at 1:00 a.m. She was

waiting for the victim, who had to balance the account and prepare the bank deposit. At approximately 2:00 a.m., a man in dark clothes and a ski mask and brandishing a gun appeared in the rear doorway. A second man threatened to shoot Ms. Hoard and ordered her to lie on the floor. She saw a third man standing at the rear door. Soon, she heard shots and screaming.

Preston Shea testified that, as the head bartender when the restaurant closed, he was helping the manager, Mr. Frieling, account for the receipts. Upon walking out of the office, he encountered four masked, armed men in the hall. One of them hit Mr. Shea in the head with an object, and he fell to the floor near the rear door. The men demanded money, and Mr. Shea gave them his wallet. Some of the men went into the office and passed the restaurant money out to the other men in the hall. Someone said, "Shoot the m-----f-----," and then a shot was fired. As the intruders left through the hall, Mr. Shea was shot. He testified, "I got shot three times for lying there in a pool of kitchen slop doing exactly what they asked." When the men left, Mr. Shea crawled into the office and called 9-1-1.

Darrick Jones testified that he worked at TGIF on the evening of January 27 until the restaurant closed at 1:00 a.m. When he went to his car parked in the rear about 1:30 a.m., he saw a white Pontiac Bonneville or Parisian with a dark top pass through the parking area. The car contained at least four people.

On February 7, 1995, based upon Mr. Jones's information and a Crime Stoppers tip, officers stopped a white Pontiac driven by Claude Sharkey. A young man named Anthony Moore, also known as Anthony Morgan, was riding in the Pontiac. The officers found a .380 automatic pistol containing seven live rounds hidden under the Pontiac's dash board. Within a short time, officers apprehended Claushaun Sharkey and Kevin Wilson, and pursuant to statements given by these men, they went to the [Petitioner's] residence. Upon finding the [Petitioner] at home and after obtaining permission to search the house, the officers found a .32 revolver in a box under the [Petitioner's] mother's bed, a black leather jacket, and a ski mask.

Apparently prompted by being shown Wilson's prior statement wherein he implicated the [Petitioner], the [Petitionmer] told the officers, "I was there, but I didn't go inside." He gave a written statement in which he recounted that the Sharkeys and Wilson were responsible for the TGIF robbery and homicide. He admitted that, although he had been asleep in the car, after the other three

men discussed robbing TGIF, he "walked up there" with them. He stated, "I stayed all the way in the back and they ran in the restaurant and I heard some shots fired so I ran to the car . . . ." The [Petitioner] recounted that, after returning to the Sharkeys' house, the men gave him $200.

A forensics analyst testified that he could discern no identifiable fingerprints on the .32 revolver. He analyzed a .380 bullet recovered from the victim and a .380 shell casing found at the crime scene and determined that they were fired from the .380 pistol recovered from the Sharkeys' Pontiac. The officers had also recovered a nine millimeter bullet fragment but found no evidence of projectiles being fired by a .32 pistol.

In his defense, the [Petitioner] called his mother, who testified that the .32 revolver belonged to her and that she never knew of the [Petitioner] taking it. He also called Claude Sharkey's ex-girlfriend, who testified that she had never known the [Petitioner] to have been a part of the group of the Sharkeys, Kevin Wilson, and Anthony Morgan, the four of whom were "running buddies."

Anthony Morgan, Kevin Wilson, and the two Sharkeys testified for the [Petitioner]. Morgan testified that the [Petitioner] was not a "running buddy" of the Sharkeys. He denied the truth of his prior statement that, on Saturday, January 28, 1995, the [Petitioner] was at the Sharkeys' home when Morgan arrived.

Wilson testified that he, the two Sharkeys, Morgan, and the [Petitioner] were all in the Pontiac in the early morning hours of January 28, 1995. Claude Sharkey suggested robbing TGIF. The [Petitioner] and Morgan stayed in the car, and Wilson testified that the [Petitioner] stated that he would having nothing to do with the robbery. Wilson testified that he and Claude Sharkey had guns. He heard Claude Sharkey's gun fire but did not see him shoot the manager. Wilson did not shoot the manager but did shoot the bartender, although he claimed he did so unintentionally. Wilson admitted that his prior statement was contradictory to his trial testimony but maintained that he was scared when he made the false statements in his pretrial statement. Wilson acknowledged that his prior statement said that the [Petitioner] entered TGIF with the other men, that the [Petitioner] had a pistol, that the pistol resembled the one removed from the [Petitioner]'s house, and that the [Petitioner] and Claude Sharkey told Wilson to shoot the bartender; however, Wilson testified that these statements were untrue and that the [Petitioner] never left the car.

Claushaun Sharkey testified that he and Claude Sharkey, the [Petitioner], Kevin Wilson, and "Little Anthony" Morgan had been together during the day and evening of January 27, 1995, smoking marijuana, drinking, and playing video games. Claude suggested that they rob TGIF. The five of them traveled to the location, but the [Petitioner] was too drunk to get out of the car. Wilson, Claude Sharkey, and "Little Anthony" had guns; Claushaun Sharkey did not. Claushaun Sharkey acknowledged that his pretrial statement said that the [Petitioner], rather than "Little Anthony" Morgan, entered TGIF with the other three men, but he attributed the statement to pressure from the police. He further acknowledged that his statement claimed that the [Petitioner] stood over Preston Shea and took his wallet and that the robbery had been discussed among the group before going to the TGIF. In his trial testimony, he denied the truth of these statements.

Claude Sharkey testified that he spent time drinking and smoking marijuana with the other four men on January 27, 1995. Although he had been thinking about robbing TGIF, he had not discussed the idea with anyone prior to everyone getting into the Pontiac that night. Although he was supposed to be taking everyone home, he intentionally took an expressway exit that led to TGIF. Once there, he parked, told the others of his plans, produced a few ski masks, and asked who wanted to go. "Little Anthony," Wilson, and Claushaun Sharkey opted to go, but the defendant was "too drunk." He never saw the [Petitioner] leave the car. Claude Sharkey testified that he and Wilson entered the office. He said, "I went in. I asked for money. [The victim] gave it to me, and I still shot him." He testified that he had told no one that he was going to shoot anyone during the robbery. Sharkey then testified that he and Wilson both shot the bartender. He acknowledged that in his pretrial statement, he said that the defendant came into TGIF and took the money and that he testified in a previous trial that the defendant carried a gun. He testified that these statements were untrue and that he made them in consideration of the state's promise to provide a helpful letter to the parole board.

The [Petitioner] testified that, although he spent time with the Sharkeys, Wilson, and Morgan on January 27, 1995, there had been no plan to commit a robbery. Although he thought they were driving him home that night, he was drunk and fell asleep. The Pontiac took the "wrong exit" and arrived at TGIF. When the robbery plan was discussed at TGIF, the group rebuffed his attempts to get them to take him home. He testified that they told him to stay in the car

until they came back.  When the men returned, Wilson admitted shooting someone.  The [Petitioner] testified that he had never removed his mother's .32 pistol from their house.  He claimed his pretrial statement was the result of being scared when the officers "put[ ] their hands on [him]."  He testified that, following the robbery, he received $200 in "hush" money.

*State v. Franklin Howard*, No. W2002-01680-CCA-R3-CD, 2004 WL 2715346 (Tenn. Crim. App. Nov. 18, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005).  Based upon this evidence, the Petitioner was convicted of premeditated first degree murder and two counts of felony first degree murder.  The trial court merged all of these convictions into one first degree murder conviction and imposed a life sentence.  On appeal, this Court reversed and dismissed the felony murder convictions but affirmed the Petitioner's premeditated first degree murder conviction and sentence.  *Id*. at *16.

### B. Post-Conviction

The Petitioner filed a petition for post-conviction relief claiming he received the ineffective assistance of counsel at trial.  The post-conviction court held a hearing wherein the Petitioner and his trial counsel ("Counsel") testified.  The Petitioner testified that Counsel failed to recognize a sleeping juror at trial.  He recalled that, during the trial, he noticed a juror was sleeping so he attempted to get Counsel's attention, but Counsel kept "brushing [the Petitioner] off, telling [him] he was watching and paying attention to what the Judge was saying and couldn't pay attention to what [the Petitioner] was saying."  The Petitioner testified that, at the time he was attempting to get Counsel's attention, the Judge was making a statement.  The Petitioner testified that he observed a juror sleeping for "about a minute[] or two" and that "she was dozing off and on."  The trial lasted from Monday to Saturday, and he witnessed this behavior on Friday and Saturday.

The Petitioner also recalled overhearing one of the prosecutors say to the other prosecutor, "I can't believe it, can you look at her, she's sleeping over here."  He also recounted that the Judge asked the juror after court recesses, approximately three times, whether she was okay or needed something and that the juror's response was always, "I'm okay, I'm all right."

Counsel testified that he has been licensed in Tennessee as an attorney since 1992 with his caseload, at the time of the hearing, composed of between 90% to 100% criminal law.  Counsel testified that he reviewed the trial transcript, and he recalled that, during deliberations, he was called back to chambers and informed a juror was sick. Court recessed for the evening and everyone returned the following day when the juror was feeling better,

and jury deliberations continued.

Counsel recalled that, after he filed his initial motion for a new trial, the Petitioner told Counsel about the juror that was asleep during trial, and the Petitioner's girlfriend or wife at the time of trial and his father confirmed this statement. Counsel stated he never personally observed the sleeping juror but, during the bulk of the trial, he was focused on the witness stand rather than on the jurors. Counsel said, "So I can't say that I ever observed this juror sleeping. If I had ever observed her sleeping I would certainly have raised it at the time. But, that doesn't mean she wasn't [sleeping]."

Counsel said, based upon the Petitioner's allegations, he interviewed the juror. She told him she had not been sleeping during the trial. The juror told Counsel that "she may not have heard everything that was always said during the trial, but she heard all of the important things."

At the conclusion of the hearing, the post-conviction court took the petition under advisement and later issued a written order denying post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends Counsel failed to provide effective assistance, arguing that Counsel: (1) failed to recognize the condition of a sleeping juror at trial; (2) failed to request an alternate juror or mistrial based upon the sleeping juror; and (3) failed to properly develop the proof [of the sleeping juror] in the motion for new trial and to raise the issue on direct appeal. The State responds that the Petitioner failed to establish each of his claims by clear and convincing evidence.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can only be overcome when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State,* 40

S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of

counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner's bases each of his claims about Counsel's ineffectiveness upon Counsel's failure to take action regarding a sleeping juror, both at trial and on appeal. First, he asserts that Counsel was ineffective because he failed to identify a sleeping juror at trial. Next, the Petitioner argues, Counsel was ineffective because he did not request a mistrial or alternate juror to replace the sleeping juror. Finally, he asserts that Counsel was ineffective for failing to "properly develop the proof" at the motion for a new trial and to raise the issue on direct appeal.

Upon review of the record, we conclude that the Petitioner has failed to establish by clear and convincing evidence that the juror was, in fact, asleep at trial, which is the premise upon which all his arguments rely. Counsel testified at the post-conviction hearing that he did not see a sleeping juror during the trial. After the trial, upon learning this information, Counsel interviewed the juror, and she denied falling asleep during the trial. Further at the hearing on Petitioner's motion for a new trial, the trial court stated:

> During the course of the trial, I never observed any of the jurors sleeping. It was never brought to my attention by any of the bailiffs or any of the attorneys or any of the clerks or anyone else that a juror was sleeping. It's not completely uncommon for jurors to fall asleep during the course of the trial. It's happened before; but invariably somebody in the courtroom will notice it and call it to my attention, and we'll take a recess to make sure

everybody wakes up, and then we move on.

In this case, no one, including myself, noticed anybody on the jury sleeping; and that's even borne out by the fact that you, [Counsel], checked with this juror prior to today, and she said she wasn't sleeping.

. . . .

And as I indicated, on a previous occasion, many times jurors will close their eyes or perhaps look like they're sleeping when, in fact, they're not. And it's dangerous to assume that they are sleeping without, in fact, knowing that they are sleeping. So in any event, I just see no basis whatsoever for pursuing this issue with proof, and so I'll deny that request.

Likewise, the post-conviction court, after reviewing the entire trial transcript and referencing Counsel's testimony that the juror denied falling asleep, found that no evidence in the record supported the Petitioner's claim of ineffective assistance of counsel and that Counsel acted within his discretion in not raising the issue on appeal. We too conclude that Petitioner has failed to show by clear and convincing evidence the juror was asleep and thus has failed to prove that his trial counsel was ineffective. He is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Petitioner has failed to demonstrate he received the ineffective assistance of counsel at his trial. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE